T.C. Memo. 2015-234

UNITED STATES TAX COURT

VICTOR M. KANTCHEV AND DANIELA A. KANTCHEV, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23361-13.                          Filed December 3, 2015.

Victor M. Kantchev and Daniela A. Kantchev, pro sese.

Catherine S. Tyson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined deficiencies in, an addition

under section 6651(a)(1)[1] to, and accuracy-related penalties under section 6662(a)

on petitioners' Federal income tax (tax) as follows:

---

[1]All section references are to the Internal Revenue Code (Code) in effect for
the years at issue.  All Rule references are to the Tax Court Rules of Practice and
Procedure.

| [*2] Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Accuracy-Related Penalty Under Sec. 6662(a) |
|---|---|---|---|
| 2008 | $9,360 | $61.95 | $1,872 |
| 2009 | 3,010 | --- | 602 |
| 2010 | 2,950 | --- | 590 |

The issues remaining for decision are:

(1) Did petitioner Victor M. Kantchev engage in a certain photography activity during each of the years 2008, 2009, and 2010 with the objective of making a profit within the meaning of section 183? We hold that he did not.

(2) Is petitioner Victor M. Kantchev entitled to certain losses that petitioners claimed for their taxable year 2008? We hold that he is not.

(3) Is petitioner Victor M. Kantchev liable for his taxable year 2008 for an addition to tax under section 6651(a)(1)? We hold that he is.

(4) Is petitioner Victor M. Kantchev liable for each of his taxable years 2008, 2009, and 2010 for the accuracy-related penalty under section 6662(a)? We hold that he is so liable for (a) his taxable year 2008 to the extent stated below and (b) each of his taxable years 2009 and 2010.

[*3]                              FINDINGS OF FACT

Petitioner Victor M. Kantchev (Mr. Kantchev) and respondent stipulated some of the facts, and those facts are so found.[2]

At the time petitioners filed the petition, they resided in Cape Girardeau, Missouri.

During 1990, Mr. Kantchev immigrated to the United States from Bulgaria. While residing in Bulgaria, Mr. Kantchev received a master's degree in video production and television journalism and worked as a photojournalist.

After moving to the United States, Mr. Kantchev began operating an organization called the Institute for Scientific and Cultural Exchange. That institute's activities involved bringing people to the United States for business seminars that Mr. Kantchev organized for it.

During each of the years 2008, 2009, and 2010, the taxable years at issue, Mr. Kantchev devoted most of his time to, and was preoccupied with, certain activities relating to the production of a documentary titled "Fire Lily" for a film company known as Victory Film Productions, Inc. (Victory Film), an S cor-

---

[2]Petitioner Daniela A. Kantchev (Ms. Kantchev) did not sign the stipulation of facts between respondent and Mr. Kantchev and did not appear at the trial in this case. Respondent filed a motion to dismiss for lack of prosecution as to her. We shall grant that motion and shall enter a decision with respect to Ms. Kantchev that is the same as the decision that we shall enter with respect to Mr. Kantchev.

**[*4]** poration, that he wholly owned.  Victory Film's production of "Fire Lily" did not result in a profit for that company.

Starting sometime before 2004 and continuing throughout each of the years 2008, 2009, and 2010 and thereafter, Mr. Kantchev spent some of his time doing what he enjoys, namely, taking photographs with a nondigital camera, processing the film to create negatives, scanning the negatives with a high-resolution scanner to create digital images, modifying the digital images with computer software, and printing the modified digital images on different mediums.  Since at least 2008, the first taxable year at issue, Mr. Kantchev's photography activity has included printing photographs on not only paper but also canvas and metal.  (We shall refer collectively to all of the photography-related activities that Mr. Kantchev under-took starting sometime before 2004 and continuing throughout each of the years 2008, 2009, and 2010 and thereafter as a photography activity.)  Mr. Kantchev's photography activity, which was inspired by the landscape photographer Ansel Adams, focused on panoramic landscape as the subject of the photographs that he took.

During a period that is not established by the record but that included 2008, 2009, and 2010, Mr. Kantchev took a number of trips (American West trips) to certain national parks in the American West to photograph certain subjects of

[*5] particular interest to him.  Those subjects included landscapes of the American West.  Mr. Kantchev took at least one of his American West trips during each of the years 2008, 2009, and 2010.

During each of the years 2008, 2009, and 2010, Mr. Kantchev did not have a written business plan for his photography activity.  During each of the years 2006 through 2009, Mr. Kantchev did not have any gross receipts, and during 2010 he had gross receipts totaling $1,995, from his photography activity.

During each of the years 2006 through 2010, Mr. Kantchev made certain expenditures relating to his photography activity.  During at least 2008 and 2009, Mr. Kantchev used petitioners' bank account and certain credit cards issued in petitioners' names to pay for those expenditures.

In 2013, Mr. Kantchev compiled certain of his photographs in a large hardbound book (large book).  (We shall refer to the collection of photographs in the large book as the American West collection.)  In 2013, Mr. Kantchev also compiled certain of his photographs from the American West collection in a smaller hardbound book (small book).  Thereafter, at a time not established by the record, Mr. Kantchev attempted to sell all of the large books and all of the small

[*6] books that he had compiled.[3] He was successful in selling some of each type of book.[4]

At the time of the trial in this case, Mr. Kantchev's son, Alexander V. Kantchev (Alexander), who had a bachelor's degree in economics and international business and was pursuing a master's degree in business administration specializing in finance management, was helping Mr. Kantchev market certain of the products that Mr. Kantchev had produced in his photography activity (Mr. Kantchev's photography-activity products), such as the large book and the small book and certain of Mr. Kantchev's photographs printed on metal and on canvas. At times not established by the record, Alexander helped Mr. Kantchev market Mr. Kantchev's photography-activity products while he was abroad on certain school trips.

During each of the years 2008, 2009, and 2010, Ms. Kantchev worked as a registered nurse for which she received wages. During at least some of those

---

[3]The record does not establish how many large books and how many small books Mr. Kantchev had compiled as of the time of the trial in this case.

[4]There is no reliable evidence in the record establishing how many of the large books and how many of the small books Mr. Kantchev was successful in selling as of the time of the trial in this case.

**[\*7]** years, Ms. Kantchev was engaged in certain activities relating to psychotherapy (psychotherapy activity).

During each of the years 2008, 2009, and 2010, petitioners received certain rent from the leasing of certain residential property.

Petitioners filed Form 1040, U.S. Individual Income Tax Return (return), for their taxable year 2005 (2005 return). In their 2005 return, petitioners showed wages of $54,959 and claimed a business loss of $8,344 from Schedule C, Profit or Loss From Business (Schedule C).[5]

Petitioners filed a return for their taxable year 2006 (2006 return). In their 2006 return, petitioners showed wages of $53,732 and claimed a business loss of $3,449 from Schedule C.[6]

Victory Film filed Form 1120S, U.S. Income Tax Return for an S Corporation (S corporation return), for its taxable year 2007 (2007 S corporation return) that Ivan Stoilov (Mr. Stoilov), a return preparer, had prepared. In its 2007

---

[5]Petitioners' 2005 return that is in the record contains two Schedules C, both of which have not been completed except for showing "Victor M. Kantchev" and "Daniela A. Kantchev", respectively, as proprietors.

[6]Petitioners' 2006 return that is in the record contains two Schedules C, both of which have not been completed except for showing "Victor M. Kantchev" and "Daniela A. Kantchev", respectively, as proprietors.

**[*8]** S corporation return, Victory Film showed no total income and claimed $95,702 of deductions and a loss (2007 loss) in the same amount.

Petitioners filed a return for their taxable year 2007 (2007 return) that Mr. Stoilov had prepared. In their 2007 return, petitioners showed wages of $54,972 relating to Ms. Kantchev's work as a registered nurse. Petitioners included Schedule C for Mr. Kantchev's photography activity (2007 photography Schedule C) as part of their 2007 return. In the 2007 photography Schedule C, petitioners showed no gross receipts and no gross income and claimed total expenses of $1,773 and a loss in the same amount. Petitioners also included Schedule C for Ms. Kantchev's psychotherapy activity (2007 psychotherapy Schedule C) as part of their 2007 return. In the 2007 psychotherapy Schedule C, petitioners showed no gross receipts and no gross income and claimed total expenses of $3,792 and a loss in the same amount. Petitioners included Schedule E, Supplemental Income and Loss (2007 Schedule E), as part of their 2007 return. In the 2007 Schedule E, petitioners showed rents received of $1,677 and claimed total expenses of $6,952 and a loss of $5,275 from the leasing of certain residential property. In the 2007 Schedule E, petitioners also claimed a flowthrough loss (2007 flowthrough loss) of $95,702 attributable to Victory Film's claimed 2007 loss. Petitioners were

[*9] unable to use all of petitioners' claimed 2007 flowthrough loss for their taxable year 2007.

Victory Film filed an S corporation return for its taxable year 2008 (2008 S corporation return) that Mr. Stoilov had prepared. In its 2008 S corporation return, Victory Film showed no total income and claimed $9,550 of deductions and a loss (2008 loss) in the same amount.

On May 9, 2009, petitioners filed a return for their taxable year 2008 (2008 return) that Mr. Stoilov had prepared. In their 2008 return, petitioners showed wages of $81,829 relating to Ms. Kantchev's work as a registered nurse. Petitioners included Schedule A, Itemized Deductions (2008 Schedule A), as part of their 2008 return. In the 2008 Schedule A, petitioners claimed a loss carryover of $50,565 (2007 loss carryover to 2008), which was the unused portion of the 2007 flowthrough loss. Petitioners included Schedule C for Mr. Kantchev's photography activity (2008 photography Schedule C) as part of their 2008 return. In the 2008 photography Schedule C, petitioners showed no gross receipts and no gross income and claimed total expenses of $3,224 and a loss in the same amount. Petitioners also included Schedule C for Ms. Kantchev's psychotherapy activity (2008 psychotherapy Schedule C) as part of their 2008 return. In the 2008 psychotherapy Schedule C, petitioners showed gross receipts of $21,897 and gross

[*10] income in the same amount and claimed total expenses of $11,825 and a profit of $10,072 (2008 psychotherapy Schedule C profit). Petitioners included Schedule E (2008 Schedule E) as part of their 2008 return. In the 2008 Schedule E, petitioners showed rents received of $2,224 and claimed total expenses of $4,284 and a loss of $2,060 from the leasing of certain residential property. In the 2008 Schedule E, petitioners also claimed a flowthrough loss (2008 flowthrough loss) of $9,550 attributable to Victory Film's claimed 2008 loss.

Petitioners filed a return for their taxable year 2009 (2009 return) that Mr. Stoilov had prepared. In their 2009 return, petitioners showed wages of $104,498 relating to Ms. Kantchev's work as a registered nurse. Petitioners included Schedule C for Mr. Kantchev's photography activity (2009 photography Schedule C) as part of their 2009 return. In the 2009 photography Schedule C, petitioners showed no gross receipts and no gross income and claimed total expenses of $12,543 and a loss in the same amount. Petitioners included Schedule E (2009 Schedule E) as part of their 2009 return. In the 2009 Schedule E, petitioners showed rents received of $2,591 and claimed total expenses of $4,830 and a loss of $2,239 from the leasing of certain residential property.

Petitioners filed a return for their taxable year 2010 (2010 return) that Mr. Stoilov had prepared. In their 2010 return, petitioners showed wages of $112,522

[*11] relating to Ms. Kantchev's work as a registered nurse. Petitioners included Schedule C for Mr. Kantchev's photography activity (2010 photography Schedule C) as part of their 2010 return. In the 2010 photography Schedule C, petitioners showed gross receipts and gross income of $3,500[7] and claimed total expenses of $12,705 and a loss of $9,205. Petitioners included Schedule E (2010 Schedule E) as part of their 2010 return. In the 2010 Schedule E, petitioners showed rents received of $3,014 and claimed total expenses of $2,375 and a gain of $639 (2010 rental activity gain) from the leasing of certain residential property.

On June 24, 2009, the Internal Revenue Service (IRS) issued KS/MO-2009-45, "Missouri Severe Storms and Flooding Victims May Qualify for IRS Disaster Relief" (IRS disaster relief notice). That notice stated in pertinent part that "the IRS is postponing until July 7, 2009, certain deadlines for taxpayers who reside or have a business in the disaster area. The postponement applies to return filing, tax payment and certain other time-sensitive acts otherwise due between May 8, 2009, and July 7, 2009." The IRS disaster relief notice stated in pertinent part:

> Under section 7508A, the IRS gives affected taxpayers until May 8, 2009, [sic] to file most tax returns (including individual, corporate, and estate and trust income tax returns; partnership returns, S corporation returns, and trust returns; estate, gift, and generation-

[7]Of the $3,500 of gross receipts that petitioners showed in the 2010 photography Schedule C, $1,505 was received in 2011.

**[*12]** skipping transfer tax returns; and employment and certain excise tax returns), or to make tax payments, including estimated tax payments, that have either an original or extended due date occurring on or after May 8, 2009, and on or before July 7, 2009.

The IRS disaster relief notice showed petitioners' area of residence, Cape Girardeau, as one of the Federal disaster areas that qualified for the relief specified in that notice.

Respondent issued a notice of deficiency (notice) to petitioners for their taxable years 2008, 2009, and 2010. In that notice, respondent determined, inter alia, to disallow the respective expenses and the respective losses that petitioners had claimed in the 2008 photography Schedule C, the 2009 photography Schedule C, and the 2010 photography Schedule C. Respondent also determined in that notice to disallow petitioners' claimed 2007 loss carryover to 2008 and their claimed 2008 flowthrough loss. Respondent also determined in the notice that petitioners are liable for their taxable year 2008 for an addition to tax under section 6651(a)(1) and that they are liable for each of their taxable years 2008, 2009, and 2010 for the accuracy-related penalty under section 6662(a).

**[*13]**                           OPINION

Mr. Kantchev bears the burden of establishing that the determinations in the notice that remain at issue are erroneous.[8]  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and Mr. Kantchev must prove his entitlement to any deductions claimed.  See <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).  The Code and the regulations thereunder required Mr. Kantchev to maintain records sufficient to establish the amount of any deduction claimed.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Before turning to the issues that remain for decision, we shall evaluate the testimony of Mr. Kantchev on which he relies in support of his positions with respect to those issues, the testimony of Mr. Stoilov on which Mr. Kantchev relies in support of certain of those issues, and the testimony of Alexander on which Mr. Kantchev relies in support of one of those issues.

We found the testimony of Mr. Kantchev to be in certain material respects uncorroborated, general, self-serving, vague, and conclusory.  We shall not rely on

---

[8]Throughout his opening brief, Mr. Kantchev advances and relies on numerous factual contentions that are not supported by the record established at the trial in this case.  We shall not rely on those contentions in resolving the issues presented.

**[\*14]** the testimony of Mr. Kantchev to establish his respective positions with respect to the issues presented. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

We found the testimony of Mr. Stoilov to be in certain material respects uncorroborated, general, and vague. We shall not rely on the testimony of Mr. Stoilov to establish Mr. Kantchev's respective positions with respect to the issues presented about which Mr. Stoilov testified. See, e.g., id.

We found the testimony of Alexander to be in certain material respects uncorroborated, general, vague, conclusory and serving the interests of Mr. Kantchev, his father.[9] We shall not rely on the testimony of Alexander to establish Mr. Kantchev's position with respect to the issue presented about which Alexander testified. See, e.g., id.

Section 183

Section 183(a) generally limits the amount of expenses that a taxpayer may deduct with respect to an activity "not engaged in for profit" to the deductions provided in section 183(b). Section 183(b)(1) provides that deductions that would be allowable without regard to whether such activity is engaged in for profit are to

---

[9]Mr. Kantchev seemed to want us to treat Alexander as an expert in marketing. We decline to do so. See Rule 143(g).

[*15] be allowed. Section 183(b)(2) further provides that deductions which would be allowable only if such activity is engaged in for profit are to be allowed, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable under section 183(b)(1). An activity is "not engaged in for profit" if it is an activity other than one with respect to which deductions are allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c).

In determining whether an activity is engaged in for profit for purposes of section 183, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g., Keating v. Commissioner, 544 F.3d 900, 905 (8th Cir. 2009), aff'g T.C. Memo. 2007-309; Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). Although the taxpayer's expectation of a profit need not be reasonable, he or she must have a good-faith objective of making a profit. E.g., Keating v. Commissioner, 544 F.3d at 905; Dreicer v. Commissioner, 78 T.C. at 645; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd on another issue, 615 F.2d 578 (2d Cir. 1980); sec. 1.183-2(a), Income Tax Regs. The taxpayer bears the burden of proving the requisite intent. E.g., Golanty v. Commissioner, 72 T.C. 411, 426

[*16] (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 814 (1973), aff'd, 495 F.2d 1079 (6th Cir. 1974); see Dreicer v. Commissioner, 78 T.C. at 646.

Whether a taxpayer engaged in an activity with the requisite profit objective is determined from all the facts and circumstances. E.g., Hulter v. Commissioner, 91 T.C. at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's mere statement of his or her intent. E.g., Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists the following factors that should normally be taken into account in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or loss with respect to the activity, (7) the amount of occasional profit, if any, which is earned, (8) the financial status of the taxpayer, and (9) the extent to which ele-

[*17] ments of personal pleasure or recreation are involved. The list of factors in the regulations is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective does not depend on counting the number of factors that support each party's position. E.g., Dunn v. Commissioner, 70 T.C. 715; sec. 1.183-2(b) Income Tax Regs. We consider now the factors in the regulations.

Manner in which Mr. Kantchev carried on his photography activity

During each of the years 2008, 2009, and 2010, Mr. Kantchev did not have a written business plan for his photography activity. Moreover, the record is devoid of any evidence that Mr. Kantchev maintained any books or records relating to his photography activity. Mr. Kantchev's failure to have a business plan and to maintain books or records relating to his photography activity indicates that he did not conduct that activity in a businesslike manner.

During at least 2008 and 2009, Mr. Kantchev used petitioners' bank account and certain credit cards issued in petitioners' names to pay expenses relating to Mr. Kantchev's photography activity. Mr. Kantchev's use of that bank account and those credit cards to pay expenses relating to Mr. Kantchev's photography

[*18] activity indicates that Mr. Kantchev did not conduct that photography activity in a businesslike manner.

On the instant record, we find that factor (1) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Expertise of Mr. Kantchev or his advisors

During 1990, Mr. Kantchev immigrated to the United States from Bulgaria. While residing in Bulgaria, Mr. Kantchev received a master's degree in video production and television journalism and worked as a photojournalist.

Mr. Kantchev's work in Bulgaria as a photojournalist and his photography activity in the United States do not establish that Mr. Kantchev has expertise in sound "business * * * [and] economic * * * practices" of the photography business or that even if he had that expertise, he used it when conducting his photography activity. See sec. 1.183-2(b)(2), Income Tax Regs. That Mr. Kantchev may be a very good photographer does not mean that he conducted his photography activity using sound "business * * * [and] economic * * * practices" of the photography business.

Moreover, the record does not establish that Mr. Kantchev received or relied on the advice of an expert in the field of photography. See sec. 1.183-2(b),

[*19] Income Tax Regs. Although Alexander, who as of the time of the trial in this case had a bachelor's degree in economics and international business and was pursuing a master's degree in business administration specializing in finance management, was helping Mr. Kantchev market Mr. Kantchev's photography-activity products, the record does not establish that Alexander had any practical expertise in conducting any business, let alone a photography business.

On the instant record, we find that factor (2) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Time and effort expended by Mr. Kantchev

During each of the years 2008, 2009, and 2010, Mr. Kantchev devoted most of his time to, and was preoccupied with, certain activities relating to the production of "Fire Lily" for Victory Film. Although we have found that Mr. Kantchev spent some of his time during each of the years 2008, 2009, and 2010 on his photography activity, which he enjoyed, the record establishes that that time paled in comparison with the time that he spent during each of those years on the production of "Fire Lily". We believe that the time that Mr. Kantchev spent on his photography activity during each of the years 2008, 2009, and 2010 is consistent

[*20] with his enjoyment of photography, as opposed to the operation of a photography business.

On the instant record, we find that factor (3) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Expectation that the assets used in the activity may appreciate in value

Mr. Kantchev has not established through his testimony, and the record does not otherwise establish, what specific assets Mr. Kantchev used in his photography activity. Even if the record had established what those assets were, the record does not establish the respective costs or values or the expected appreciation, if any, of any such assets.

On the instant record, we find that factor (4) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Success of Mr. Kantchev in carrying on other similar or dissimilar activities

In addition to his photography activity, the record establishes that Mr. Kantchev has been engaged in only two activities since immigrating to the United States. After moving to the United States, Mr. Kantchev began operating an organization called the Institute for Scientific and Cultural Exchange. That

[*21] institute's activities involved bringing people to the United States for business seminars that Mr. Kantchev organized for it. The record does not establish whether Mr. Kantchev was successful in carrying on the activities that he undertook for the Institute for Scientific and Cultural Exchange.

During at least each of the years 2008, 2009, and 2010, Mr. Kantchev engaged in certain activities relating to the production of "Fire Lily" for Victory Film. We have found that Victory Film's production of "Fire Lily" did not result in a profit for that company.

On the instant record, we find that factor (5) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Mr. Kantchev's history of income or loss with respect to the activity and amount of occasional profit, if any[10]

Except for Mr. Kantchev's taxable year 2010, Mr. Kantchev did not have any gross receipts from his photography activity during any of his taxable years 2005 through 2010. During his taxable year 2010, Mr. Kantchev received $1,995

---

[10]We consider together the two factors in the heading.

[*22] in gross receipts from that activity.[11] Moreover, for each of his taxable years 2005 through 2010, Mr. Kantchev claimed a loss relating to his photography activity.

Mr. Kantchev asserts that the reason he did not have sales or profits from his photography activity during each of his taxable years 2008, 2009, and 2010 was that those years "were the worst possible years for the art market". According to Mr. Kantchev, "[t]he market contracted so much that it was almost impossible to sell anything, any art." However, Mr. Kantchev acknowledged during his testimony that he spent most of his time during each of the years 2008, 2009, and 2010 on activities relating to Victory Film's production of "Fire Lily", not on his photography activity, and that his spending so much time on activities for Victory Film contributed to his not having made a profit from his photography activity for any of those years.

Mr. Kantchev and respondent stipulated that Mr. Kantchev's photography activity did not result in a profit for any of Mr. Kantchev's taxable years 2005 through 2010. Mr. Kantchev asserted at trial that his photography activity resulted in a profit for the taxable years after the last taxable year at issue that had ended as of the time of the trial (i.e., 2011, 2012, and 2013). That is to say, Mr. Kantchev

---

[11]See supra note 7.

[*23] claims that that activity resulted in a profit for each of his taxable years 2011, 2012, and 2013. However, he failed to provide any evidence corroborating that testimony.

On the instant record, we find that factors (6) and (7) in section 1.183-2(b), Income Tax Regs., do not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

Financial status

Petitioners showed the wages that Ms. Kantchev received for her work as a registered nurse in their return for each of their taxable years 2008 through 2010. Petitioners showed the 2008 psychotherapy Schedule C profit of Ms. Kantchev in their 2008 return. All of the wage income that petitioners showed in each of their 2008 return, 2009 return, and 2010 return was attributable to Ms. Kantchev. All of the profit that petitioners showed in their 2008 return was attributable to Ms. Kantchev's 2008 psychotherapy Schedule C. The loss that petitioners claimed in the 2008 photography Schedule C offset by approximately 4 percent the total amount of the wages of Ms. Kantchev that petitioners reported in their 2008 return and the 2008 psychotherapy Schedule C profit of Ms. Kantchev. The loss that petitioners claimed in the 2009 photography Schedule C offset by approximately 12 percent the wages of Ms. Kantchev that petitioners reported in their 2009

[*24] return. The loss that petitioners claimed in the 2010 photography Schedule C offset by approximately 8 percent the total of the wages of Ms. Kantchev that petitioners reported in their 2010 return and petitioners' 2010 rental activity gain shown in the 2010 Schedule E.

On the record before us, we find that factor (8) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

<u>Extent to which elements of personal pleasure or recreation are involved</u>

Starting sometime before 2004 and continuing throughout each of the years 2008, 2009, and 2010 and thereafter, Mr. Kantchev engaged in his photography activity. Mr. Kantchev acknowledged, and we have found as a fact, that he enjoys photography and taking photographs of panoramic landscapes.

On the instant record, we find that factor (9) in section 1.183-2(b), Income Tax Regs., does not support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

The record does not establish any other factors that support Mr. Kantchev's position that he engaged in his photography activity with an actual and honest objective of making a profit.

**[\*25]** Based upon our examination of the entire record before us, we find that Mr. Kantchev has failed to meet his burden of establishing that he engaged in his photography activity with the objective of making a profit within the meaning of section 183.

Petitioners' claimed 2007 loss carryover
to 2008 and claimed 2008 flowthrough loss

Victory Film, an S corporation that Mr. Kantchev wholly owned, claimed a loss in its 2007 S corporation return. As a result, petitioners claimed Victory Film's claimed 2007 loss as a so-called flowthrough loss from an S corporation in their 2007 return. Petitioners were unable to use all of their claimed 2007 flow-through loss for their taxable year 2007. Consequently, petitioners claimed the unused portion of that claimed flowthrough loss as a carryover loss in their 2008 return. Victory Film also claimed a loss in its 2008 S corporation return. As a result, petitioners claimed Victory Film's claimed 2008 loss as a flowthrough loss in their 2008 return.

It is respondent's position that petitioners are not entitled to the claimed 2007 carryover loss to 2008 and the claimed 2008 flowthrough loss because Victory Film did not make an election under section 181(a)(1) for its taxable year

**[\*26]** 2007 to treat certain costs of producing "Fire Lily" as expenses that are not chargeable to capital account and that are deductible.

Section 181(a)(1) allows a taxpayer to elect to "treat the cost of any qualified film or television production as an expense which is not chargeable to capital account." If a taxpayer makes an election under section 181(a)(1), the taxpayer is entitled to deduct any such cost.

A taxpayer must make an election under section 181(a)(1) "in such manner as prescribed by the Secretary and by the due date (including extensions) for filing the taxpayer's return of tax under this chapter for the taxable year in which costs of the production are first incurred." Sec. 181(c)(1). In order for the election to be effective, "the taxpayer must attach a statement to the return stating that the taxpayer is making an election under section 181". Sec. 1.181-2T(c)(1), Temporary Income Tax Regs., 72 Fed. Reg. 6161-6162 (Feb. 9, 2007).

Mr. Kantchev acknowledges that a statement making an election under section 181(a)(1) "was not filed technically" with Victory Film's 2007 S corporation return. As we understand his position, Mr. Kantchev does not dispute that Victory Film did not attach a statement to its 2007 S corporation return in which it indicated that it was making an election under section 181(a)(1), as required by section 181(c)(1) and section 1.181-2T(c)(1), Temporary Income Tax Regs., <u>supra</u>.

[*27] Mr. Kantchev maintains that Victory Film nonetheless is entitled for each of its taxable years 2007 and 2008 to treat certain costs of producing a certain film (film production costs) as expenses that are not chargeable to capital account and that are deductible.

In support of his position, Mr. Kantchev argues that although a statement making an election under section 181(a)(1) "was not filed technically" with Victory Film's 2007 S corporation return, Victory Film's deduction of certain film production costs in its 2007 S corporation return nonetheless satisfies the election requirement under section 181(a)(1). In advancing that argument, Mr. Kantchev relies on certain legislative history of section 181. According to Mr. Kantchev, "[t]he legislative history * * * states that: 'deducting qualifying costs on the appropriate tax return shall constitute a valid election'".

We reject Mr. Kantchev's argument that the legislative history of section 181 shows that Congress intended to allow a taxpayer to make an election under section 181(a)(1) by deducting the expenses for qualifying film production costs in the taxpayer's return for the year in which those costs are incurred. In quoting certain legislative history of section 181 in support of his argument, Mr. Kantchev intentionally or unintentionally omits part of the sentence that he quotes. The entire sentence in that legislative history from which Mr. Kantchev quotes only an

**[*28]** excerpt states: "The Committee intends that, in the absence of specific guidance by the Secretary, deducting qualifying costs on the appropriate tax return shall constitute a valid election." H.R. Conf. Rept. No. 108-755, at 372 n.200 (2004), 2004 U.S.C.C.A.N. 1341, 1443. The temporary regulations under section 181 provide specific guidance on how a taxpayer is required to make an election under that section. That guidance required Victory Film to attach a statement to its 2007 return in which it indicated that it was making an election under section 181. See sec. 1.181-2T(c)(1), Temporary Income Tax Regs., supra.

Mr. Kantchev also purports to rely on the so-called substantial compliance doctrine in further support of his position that Victory Film is entitled for each of its taxable years 2007 and 2008 to treat film production costs as expenses that are not chargeable to capital account and that are deductible, even though Victory Film did not attach a statement to its 2007 S corporation return in which it indicated that it was making an election under section 181(a)(1). That is because, Mr. Kantchev maintains, we "may apply the substantial compliance doctrine * * * to excuse the petitioner from strict compliance with procedural regulatory requirements if the petitioner substantially complied by fulfilling the essential statutory purpose." Although Mr. Kantchev refers to the Federal tax law doctrine of

**[*29]** substantial compliance, he does not appear to understand that doctrine.[12]

Instead, Mr. Kantchev appears to be arguing that, as long as Victory Film fulfilled

the intent of Congress in enacting section 181, Victory Film's failure to satisfy the

election requirement that section 181(a)(1) imposes does not control whether

Victory Film's "production qualifies for * * * the benefits of this election".

Although his argument is not entirely clear, it appears that Mr. Kantchev is

arguing that Victory Film should be entitled to treat its film productions costs as

expenses that are not chargeable to capital account and that are deductible because

Congress intended section 181 to apply to the types of film production costs that

Victory Film incurred during 2007 as well as 2008.

On the record before us, we reject Mr. Kantchev's argument. That argument

ignores the requirement that section 181 explicitly imposes; namely, in order to

deduct certain qualifying film production costs, a taxpayer must make an election

to treat those costs as expenses that are not chargeable to capital account "in such

manner as prescribed by the Secretary and by the due date (including extensions)

---

[12]In Samueli v. Commissioner, 132 T.C. 336, 345 (2009), we summarized the substantial compliance doctrine as follows: "The substantial compliance doctrine is a narrow equitable doctrine that courts may apply to avoid hardship where a party establishes that the party intended to comply with a provision, did everything reasonably possible to comply with the provision, but did not comply with the provision because of a failure to meet the provision's specific requirements."

**[\*30]** for filing the taxpayer's return of tax under this chapter for the taxable year in which costs of the production are first incurred." Sec. 181(c)(1).

On the record before us, we find that Victory Film did not make an election under section 181(a)(1) for its taxable year 2007 to treat certain film production costs as expenses that are not chargeable to capital account and that are deductible.

Based upon our examination of the entire record before us, we find that Mr. Kantchev is not entitled for his taxable year 2008 to the 2007 loss carryover to 2008 and to the 2008 flowthrough loss.

Sections 6651(a)(1) and 6662(a)

Respondent bears the burden of production with respect to the addition to tax under section 6651(a)(1) and the accuracy-related penalties under section 6662(a) that respondent determined in the notice. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). To satisfy respondent's burden of production, respondent must come forward with "sufficient evidence indicating that it is appropriate to impose" the penalties. Higbee v. Commissioner, 116 T.C. at 446. Although respondent bears the burden of production with respect to the addition to tax under section 6651(a)(1) and the penalty under section 6662(a), respondent "need not introduce evidence regarding reasonable cause * * * or

**[*31]** similar provisions. * * * [T]he taxpayer bears the burden of proof with regard to those issues." Id.

Section 6651(a)

Section 6651(a)(1) imposes an addition to tax for failure to file timely a tax return. The addition to tax for failure to file under section 6651(a)(1) does not apply if the failure to file timely is due to reasonable cause, and not due to willful neglect. See sec. 6651(a)(1).

Petitioners' 2008 return was due without extensions on April 15, 2009. See sec. 6072(a). Petitioners did not file their 2008 return until May 9, 2009.

On the record before us, we find that respondent has carried respondent's burden of production under section 7491(c) with respect to the addition to tax under section 6651(a)(1) that respondent determined for Mr. Kantchev's taxable year 2008.

It is Mr. Kantchev's position that petitioners' failure to file timely a tax return was due to reasonable cause, and not due to willful neglect. In support of that position, Mr. Kantchev advances an argument (IRS disaster relief notice argument) that the IRS in effect extended the due date for filing petitioners' tax return for their taxable year 2008 in the IRS disaster relief notice. That notice stated in pertinent part: "[T]he IRS is postponing until July 7, 2009, certain

**[*32]** deadlines for taxpayers who reside or have a business in the disaster area. The postponement applies to return filing, tax payment and certain other time-sensitive acts otherwise due between May 8, 2009, and July 7, 2009."

Although Mr. Kantchev's IRS disaster relief notice argument is difficult to follow because it is illogical and does not make sense,[13] our understanding of that argument is as follows. Mr. Kantchev maintains that petitioners resided in the disaster area specified in the IRS disaster relief notice and that petitioners' 2008 return was not due until October 15, 2009, because they had requested an automatic extension of time until that date within which to file their tax return for their taxable year 2008. Consequently, according to Mr. Kantchev, the filing date for that tax return fell between May 8 and July 7, 2009. As a result, Mr. Kantchev asserts that under the relief provided in the IRS disaster relief notice the date by which petitioners were required to file their tax return for their taxable year 2008 was extended until July 7, 2009. Because petitioners filed that return on May 9, 2009, Mr. Kantchev asserts that it was timely filed.

---

[13]If petitioners had in fact requested an automatic extension of time until October 15, 2009, within which to file their tax return for their taxable year 2008, as Mr. Kantchev asserts, it would make no sense, and it would be unnecessary, for him to rely on the IRS disaster relief notice.

**[*33]** Although Mr. Kantchev testified that petitioners had requested an automatic extension of time within which to file their tax return for their taxable year 2008, that testimony is not corroborated by any reliable evidence in the record.[14] On the record before us, we find that Mr. Kantchev has failed to carry his burden of establishing that petitioners requested such an extension of time. On that record, we further find that the IRS disaster relief notice is not applicable to petitioners' tax return for their taxable year 2008 and did not extend the filing date for that return to July 7, 2009. On the record before us, we find that Mr. Kantchev has failed to carry his burden of establishing that his failure to file timely his 2008 return was due to reasonable cause, and not due to willful neglect.

Based upon our examination of the entire record before us, we find that Mr. Kantchev has failed to carry his burden of establishing that he is not liable for his taxable year 2008 for the addition to tax under section 6651(a)(1).

Section 6662(a)

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the underpayment to which section 6662 applies. Section 6662 applies to the portion of any underpayment which is attributable to, inter alia, (1) negligence or disre-

---

[14]Mr. Stoilov, petitioners' return preparer, did not recall whether he in fact requested on petitioners' behalf an automatic extension of the time within which petitioners were required to file their tax return for their taxable year 2008.

[*34] gard of rules or regulations, sec. 6662(b)(1), or (2) a substantial understatement of tax, sec. 6662(b)(2).

The term "negligence" in section 6662(b)(1) includes any failure to make a reasonable attempt to comply with the Code. Sec. 6662(c). Negligence has also been defined as a failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), aff'g T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), aff'd, 893 F.2d 656 (4th Cir. 1990). The term "negligence" also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

For purposes of section 6662(b)(2) an understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the return. Sec. 6662(d)(2)(A). An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $5,000. Sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and

**[*35]** that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on all the pertinent facts and circumstances, including the taxpayer's efforts to assess the taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Mr. Kantchev does not dispute that he is liable for the accuracy-related penalty for each of his taxable years 2008, 2009, and 2010 with respect to the portion of the underpayment for each of those years that is attributable to the loss that petitioners claimed in each of the 2008 photography Schedule C, the 2009 photography Schedule C, and the 2010 photography Schedule C.  He disputes only the accuracy-related penalty for his taxable year 2008 with respect to the portion of the underpayment for that year that is attributable to the 2007 loss carryover to 2008 and the 2008 flowthrough loss that petitioners claimed in the 2008 Schedule A and the 2008 Schedule E, respectively.  The reason he advances for disputing that penalty is that he relied on Mr. Stoilov, the preparer of petitioners' 2008 return.

Respondent advances no argument on brief as to why we should impose on Mr. Kantchev the accuracy-related penalty for his taxable year 2008 with respect

[*36] to the portion of the underpayment for that year that is attributable to the 2007 loss carryover to 2008 and the 2008 flowthrough loss that petitioners claimed in the 2008 Schedule A and the 2008 Schedule E, respectively.[15] Respondent argues only that petitioners' claim of a loss in each of the 2008 photography Schedule C, the 2009 photography Schedule C, and the 2010 photography Schedule C was attributable to negligence.

We conclude that Mr. Kantchev's failure to dispute that he should not be liable for each of his taxable years 2008, 2009, and 2010 for the accuracy-related penalty with respect to the portion of the underpayment for each of those years that is attributable to the loss that petitioners claimed in each of the 2008 photography Schedule C, the 2009 photography Schedule C, and the 2010 photography Schedule C is an abandonment by him of that issue. Even if we had not so concluded, we nonetheless would find on the record before us that since Mr.

---

[15]Respondent merely asserts on brief: "The deficiency for 2008 is $9,360.00, which exceeds $5,000." It is not clear what respondent had in mind in making that assertion. If respondent intended to make the point that there is a substantial understatement of tax within the meaning of sec. 6662(d)(1)(A) for Mr. Kantchev's taxable year 2008 and that respondent has therefore satisfied respondent's burden of production under sec. 7491(c) with respect to the accuracy-related penalty for Mr. Kantchev's taxable year 2008, we agree. That is because we have held for respondent on the two issues presented to us under secs. 183 and 181, and Mr. Kantchev did not dispute at trial any other determination in the notice that gave rise to the deficiency that respondent determined for his taxable year 2008.

[*37] Kantchev began his photography activity he has not undertaken to do with respect to that activity what a reasonable person, who has an actual and honest objective of making a profit from that activity, would have done.[16] On that record, we would further find that Mr. Kantchev has failed to carry his burden of showing that he acted with reasonable cause and in good faith to assess whether petitioners should claim for each of their taxable years 2008, 2009, and 2010 his photography activity as an activity in Schedule C with respect to which he had the objective of making a profit within the meaning of section 183. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

We conclude that respondent's failure to advance an argument on brief as to why we should impose on Mr. Kantchev the accuracy-related penalty for his taxable year 2008 with respect to the portion of the underpayment for that year that is attributable to the 2007 loss carryover to 2008 and the 2008 flowthrough loss that petitioners claimed in the 2008 Schedule A and the 2008 Schedule E, respectively, is an abandonment by respondent of the respective determinations

---

[16]For example, the record is devoid of any evidence that Mr. Kantchev maintained any books or records relating to his photography activity. For purposes of sec. 6662, the term "negligence" includes any failure by the taxpayer to keep adequate books and records. Sec. 1.6662-3(b)(1), Income Tax Regs. On the record before us, we find that respondent has carried respondent's burden of production under sec. 7491(c).

[*38] that respondent made in the notice to that effect. Even if we had not so concluded, we nonetheless would find on the record before us that there was reasonable cause for, and that Mr. Kantchev acted in good faith with respect to, the portion of the underpayment for Mr. Kantchev's taxable year 2008 that is attributable to the claimed 2007 loss carryover to 2008 and the claimed 2008 flowthrough loss. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs.

Based upon our examination of the entire record before us, we find that Mr. Kantchev has carried his burden of establishing that he is not liable for his taxable year 2008 for the accuracy-related penalty under section 6662(a) with respect to the portion of the underpayment for that year that is attributable to the 2007 loss carryover to 2008 and the 2008 flowthrough loss. On that record, we further find that Mr. Kantchev has failed to carry his burden of establishing that he is not liable for his taxable year 2008 for the accuracy-related penalty under section 6662(a) with respect to the portion of the underpayment for that year that is attributable to the loss that petitioners claimed in the 2008 photography Schedule C. On the record before us, we further find that Mr. Kantchev has failed to carry his burden of establishing that he is not liable for each of his taxable years 2009 and 2010 for the accuracy-related penalty under section 6662(a).

**[\*39]** We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>An order granting respondent's motion to dismiss for lack of prosecution as to petitioner Daniela A. Kantchev and decision under Rule 155 will be entered</u>.